# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

CHARLES WEISENBACH

    Plaintiff,

    v.

LQ MANAGEMENT,

    Defendant.

No. 3:13-cv-01663 (MPS)

## MEMORANDUM OF DECISION

In this diversity case, Plaintiff Charles Weisenbach, who worked as a hotel manager for LQ Management ("LQ"), has sued LQ for allegedly discriminating against him based on his age in violation of the Connecticut Fair Employment Practices Act ("CFEPA"), Conn. Gen. Stat. § 46a-60, when it terminated his employment. LQ moves for summary judgment, arguing that undisputed facts in the record show that LQ terminated Weisenbach because he violated its wage and hour policies by requiring an employee under his supervision to work "off the clock," and not because of age-based discrimination. I deny LQ's motion because Weisenbach has submitted enough evidence to allow a reasonable juror to find that the person who terminated him was motivated in part by age-based animus. As discussed below, I predict that the Connecticut Supreme Court would treat such a finding as sufficient to hold LQ liable for age discrimination under the CFEPA—even though it would not be sufficient for liability under the federal Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*

I.     **BACKGROUND**

The following facts are taken from the parties' statements of material fact pursuant to Local Rule 56(a) and their supporting materials. The facts are undisputed, unless otherwise indicated. (*See* Defendant's L.R. 56(a)(1) Statement, ECF No. 32-4 ("Def.'s SMF"); Plaintiff's L.R. 56(a)(2) Statement, ECF No. 41-1 ("Pl.'s SMF").)

A.     **Weisenbach's Employment with LQ**

Weisenbach was born on March 30, 1950. (Def.'s SMF ¶ 6; Pl.'s SMF ¶ 6.) He worked as a General Manager ("GM") at the Fairfield Inn by Marriott in Stamford, Connecticut, from 2003 until LQ purchased the Fairfield Inn in February 2007, and hired Weisenbach to work as the GM for the same building. (Def.'s SMF ¶ 7; Pl.'s SMF ¶ 7; Pl.'s Opp. Br., ECF No. 41 at 2.) LQ owns, operates, and provides hotel franchise services under the La Quinta Inns and La Quinta Inns & Suites brands in North America. (Def.'s Br., ECF No. 32-1 at 2.) In September 2007, Weisenbach began reporting to LQ's Regional Vice President of Region 16, Kevin Dailey. (Def.'s SMF ¶ 8; Pl.'s SMF ¶ 8.) In the second part of 2008, Weisenbach transferred to LQ's New Haven, Connecticut hotel, where he served as GM and continued reporting to Dailey. (Def.'s SMF ¶ 9; Pl.'s SMF ¶ 9.)

Weisenbach received generally positive annual reviews, and there is no evidence in the record that he was disciplined until a few months before his termination in April 2012, with one exception that involved a written warning in March 2009, which is discussed below. (Plaintiff's Statement of Material Facts in Dispute ¶ 13 ("Pl.'s Stmt. Disputed Facts"); Pl.'s Ex. 4.) Weisenbach's first supervisor, Joe Prinzo, gave Weisenbach a review in September 2007, after Weisenbach had been working for LQ for approximately seven months. (Pl.'s Stmt. Disputed Facts ¶ 17; Pl.'s Ex. 4 at 10-12.) Prinzo wrote that "Charlie shows tremendous leadership and

commitment to his property. He has developed a successful team of associates that pull together to achieve the necessary goals . . . ." (Pl.'s Stmt. Disputed Facts ¶ 17; Pl.'s Ex. 4 at 11.) In Dailey's first review of Weisenbach, for the year 2007, he noted that, "Charlie's work habits are sound. He puts in the required time to be successful at his hotel. He arrives very early each day so he can interact with guests and staff during the busy morning hours. Charlie is always open to trying new things to grow revenue at his hotel." (Pl.'s Stmt. Disputed Facts ¶ 14, Pl.'s Ex. 4 at 9.) Dailey added that "[r]esults were below expectations in both revenue and EBITDA [Earnings Before Interest, Taxes, Depreciation and Amortization]. This was not a reflection of Charlie's efforts, rather a very aggressive budget." (Pl.'s Ex. 4 at 9.) Dailey's 2008 review, issued in March 2009, stated that, "[r]esults were very good at Stamford with the exception of revenue and EBITDA. It should be noted that Charlie is not responsible for the revenue results. He implemented every idea and suggestion that was made by the team to improve those results. . . . He made sure his product and service quality was at and even above standards. . . ." (Pl.'s Ex. 4 at 7.) Dailey added that, "Charlie shows his commitment to the region and LaQuinta by transferring to New Haven at my request. He has hit the ground running and has made very nice improvements in staff quality and product quality. I appreciate your efforts here and your willingness to help your region improve. Thank you." (Pl.'s Stmt. Disputed Facts ¶ 15; Pl.'s Ex. 4 at 7.) In Weisenbach's 2009 review, issued in February 2010, Dailey stated that "Charlie has proven that he is a team player. Some people talk about that, and others quietly do things to prove it. Charlie walks the talk. He knows his hotel is not where he wants it and being aware of that is a big first step for continued improvement. Since he's been at New Haven, he has moved the hotel forward in a big way. I appreciate his efforts." (*Id.* ¶ 16; Pl.'s Ex. 4 at 5.) Dailey's last review of Weisenbach, completed in March 2011, stated that "Charlie has done a nice job

3

improving product quality at New Haven. As a seasoned veteran, he knows how to lead and motivate a staff to improve. He adjusts his schedule to fit the needs of the hotel, which includes him working most weekends. He will need to take the lead in his hotel's sales efforts . . . . This is not a problem for Charlie as he has always been actively involved in the sales process." (*Id.* ¶ 19; Pl.'s Ex. 4 at 3.) Dailey also congratulated Weisenbach on having low staff turnover, stating, "Charlie did a great job managing his team with less than 18% turnover for the entire year. Well done!" (*Id.* ¶ 20; Pl.'s Ex. 4 at 3.) Finally, Dailey stated that Weisenbach's "main goals" for 2011 "are the EBITDA and beating his competition in Smith Travel. This is not intended to reduce the need for better Medallia performance but simply a recognition that the age and style of Charlie's hotel does not lend itself to high SIR [Satisfied Intent to Return] scores." (*Id.* ¶ 21; Pl.'s Ex. 4 at 3.)

The exception referred to above occurred in March 2009, when Dailey issued Weisenbach a written warning for manipulating wage and hour records in violation of LQ policy.[1] (Def.'s SMF ¶ 49; Pl.'s SMF ¶ 49.) Weisenbach had changed the hours for some employees—by deducting time—because he believed that they were not clocking out when they had completed their work. (*Id.*) In the warning, Dailey noted that "due to Charlie's honesty in offering this information openly and the belief that Charlie's intent was not malicious or to falsify labor records, the decision was made to make this a first level written warning." (Pl.'s Stmt. Disputed Facts ¶ 77.) The written warning also stated that if the behavior occurred again, Weisenbach would be subject to further disciplinary action up to and including termination. (Def.'s SMF ¶ 49; Pl.'s SMF ¶ 49; Def.'s Ex. 18, ECF No. 32-7.)

---

[1] LQ's wage and hour policies are discussed in part I.B.

In the fall of 2011, Keith Berry replaced Dailey as Weisenbach's supervisor and as the Regional Vice President of Region 16. (Def.'s SMF ¶ 10; Pl.'s SMF ¶ 10.) Berry, who was born on July 4, 1960, visited Weisenbach's hotel on September 28, 2011. (Def.'s SMF ¶ 11-12; Pl.'s SMF ¶ 11-12.) LQ states that the purpose of the visit was for Berry "to meet Weisenbach and familiarize himself with the hotel." (Def.'s SMF ¶ 11.)

On February 3, 2012, Berry gave Weisenbach a written warning for performance issues. (Def.'s SMF ¶ 13; Pl.'s SMF ¶ 13.) Berry described a "[v]iolation of company conduct standards as outlined on pages 16 and 17 of the employee handbook" including "insubordination" and "failure to provide guest service in accordance with the hotel's service philosophy or failure to satisfactorily perform work or job assignments." (Pl.'s Ex. 9, ECF No. 41-10 at 1; Def.'s Ex. 7, ECF No. 32-6 at 1.) Specifically, Berry wrote that "many items noted as needing improvement in a previous visit to the hotel were still not up to La Quinta standards," including deep-cleaning of the Amtico floors, the bed-making process, the guest-room sheers, and the condition of the tile and grout behind the toilet. (*Id.*) Berry added that "[t]he Satisfied Intent to Return [SIR] score at property #2048 is a direct reflection of Charlie's ability to train his staff and hold them accountable for La Quinta standards of service and cleanliness. With a current SIR score of 65.1, property #2048 continues to fail in this metric. Additionally, property #2048's SIR score continues to fall below its score from the previous year." (*Id.*) Berry also wrote that Weisenbach "is expected to immediately train his staff on the correct La Quinta procedures for the items of negligence noted" and "ensure all La Quinta policies, procedures and standards are followed and maintained" at the hotel. (*Id.*) Finally, Berry warned that if Weisenbach's performance did not improve, "[a]ny future performance issues may result in further disciplinary action, up to and including termination." (*Id.*) Weisenbach had an opportunity to write comments on the form, and

he wrote, "I am up for the challenge of developing a new staff that is trained and delivering results needed to resolve the above mention [sic] issues. However I will need the Here For You support from Corp pertaining to CapEx funds that are needed to resolve on[-]going product quality issues (working condition of guest room doors, sagging mattresses, old case goods, outdate [sic] bathrooms and leaking windows causing ceiling damage) that continue to appear in the Medallia surveys." (Pl.'s Ex. 9, ECF No. 41-10 at 4; Def.'s Ex. 7, ECF No. 32-6 at 4.) Weisenbach did not complain internally that this warning was discriminatory. (Def.'s SMF ¶ 15; Pl.'s SMF ¶ 15.)

Loretta Smith, an employee in LQ's Internal Audit and Financial Reporting Department, conducted an internal audit of the petty cash in Weisenbach's hotel in March and April of 2012. (Def.'s SMF ¶ 16; Pl.'s SMF ¶ 16.) LQ avers that properties were randomly selected for the audit; Weisenbach disputes that the selection was random, but he offers no evidence to suggest that it was not random.[2] (Def.'s SMF ¶ 16; Pl.'s Opp. Br., ECF No. 41 at 27.) Smith sent an e-mail to Weisenbach on April 3, 2012, notifying him of her preliminary findings and asking for an explanation for certain items in the audit, including a payment of $120 to "Teddy for chair removal." (Def.'s SMF ¶ 17; Pl.'s SMF ¶ 17.) Weisenbach responded by e-mail on April 9, 2012, and stated that the $120 was paid to "an individual . . . to remove 48 sofa chairs from the guest rooms to our storage container." Weisenbach elaborated that "this was more cost effect[ive] than paying hourly employees to do the same job." (Def.'s SMF ¶ 18; Pl.'s SMF ¶ 18.) In Weisenbach's complaint, deposition, and statement of material facts, however, he alleges that he paid $120, not to an individual employee, but rather to a janitorial business owned by the

---

[2] Smith's affidavit states that "[t]he properties selected for audit were chosen at random by the Internal Audit Department using a non-statistical sampling method." (Def.'s Ex. 9, Smith Aff. ECF 32-6 ¶ 5.) It is unclear what a "non-statistical sampling method" means.

employee, Thad Stanley.[3] (Pl.'s SMF ¶ 31; Weisenbach Tr. at 85.) According to LQ, it employed Stanley as a "houseman" and a "van driver," and paid him a wage of $9.00 per hour. (Def.'s SMF ¶ 32.) Weisenbach could have assigned Stanley the task of removing chairs from hotel rooms as part of Stanley's regular LQ job duties. (Def.'s SMF ¶ 33; Pl.'s SMF ¶ 33; Weisenbach Tr. at 37-39.)

Smith notified the following individuals of her audit findings by email: Berry, Mikki Hughes, Vice President – Talent Acquisition & Employee Relations, and Stacy Babl, Field Human Resources Manager. (Def.'s SMF ¶ 20; Pl.'s SMF ¶ 20.) In her e-mail, Smith stated that "I initially began to question how this was determined to be more cost effective . . . however, once I obtained the attached time detail for that period, I noted that [Thad Stanley] was already set to hit over 40 hours for the week and questioned if the GM may have been attempting to avoid more overtime hours." (Def.'s SMF ¶ 21; Pl.'s SMF ¶ 21.) According to LQ, Babl recommended that Weisenbach be terminated because he had paid an employee to work "off the clock" in violation of LQ's wage and hour policies, and Berry approved the decision. (Def.'s SMF ¶¶ 22-23; Pl.'s SMF ¶¶ 22-23.) Berry met with Weisenbach on April 17, 2012, and terminated him. Weisenbach was 62 years old. (Def.'s SMF ¶ 22, Pl.'s Stmt. Disputed Facts ¶¶ 57-58.) Laura King, who was born on October 8, 1962 (Def.'s SMF ¶ 52; Pl.'s SMF ¶ 52), replaced Weisenbach as the GM in New Haven when she was 49 years old. (Def.'s SMF ¶ 51; Pl.'s SMF ¶ 51.) King had been a "floating GM" prior to Weisenbach's termination, and she had been working at Weisenbach's hotel in New Haven approximately 20 hours per week for several

---

[3] Plaintiff's SMF ¶¶ 31-32 refers to "Thad Smith," but elsewhere in the parties' briefs and statements of material fact, the employee is called "Thad Stanley."

of the preceding months. (Def.'s SMF ¶ 53; Pl.'s SMF ¶ 53; Def.'s Ex. 2, Berry Tr., ECF No. 32-35, 72-73.)

###### B.      LQ's Wage and Hour Policies

According to LQ's Employee Handbook, hourly employees "are required to clock in for all time worked," and it is the employee's "responsibility to ensure the time reported on . . . is accurate." (Def.'s SMF ¶ 34; Pl.'s SMF ¶ 34.) LQ policy prohibits employees from working "off-the-clock," and employees are told to "notify Human Resources or your General Manager if your supervisor is requiring or permitting you to work off-the-clock." (Def.'s SMF ¶ 36; Pl.'s SMF ¶ 36.) The "Standards of Conduct" section of LQ's Handbook repeats the instruction that "at no time should any employee work off the clock. You must immediately report to the Human Resources Department any request to work off the clock," and "violations of this policy can result in termination." (Def.'s SMF ¶ 38; Pl.'s SMF ¶ 38.) Also under the Standards of Conduct heading, the LQ Handbook lists grounds for immediate termination, including "providing false statements and/or willful falsification or altering of hotel records including, but not limited to . . . time cards," and "disobeying any hotel rules, department policies and procedures and supervisor's instructions, regulations, and/or statutes of the local, state, and federal government." (Def.'s SMF ¶ 39; Pl.'s SMF ¶ 39; Def.'s Ex. 4, Employee Handbook, ECF No. 32-6, at 16-17.) Finally, the LQ Handbook emphasizes that all LQ employees are employed "at will" and may be terminated "at any time, with or without cause." (Def.'s SMF ¶ 39; Pl.'s SMF ¶ 39; Def.'s Ex. 4, Employee Handbook, ECF No. 32-6, at 17.) Weisenbach acknowledged that he received, read, and understood this LQ Handbook on March 15, 2011. (Def.'s SMF ¶ 40; Pl.'s SMF ¶ 40; Def.'s Ex. 13.)

LQ also sent its managers, including Weisenbach, several memoranda emphasizing the importance of its wage and hour policies. On April 9, 2010, LQ sent managers a memo about proper time reporting in accordance with state and federal law. (Def.'s SMF ¶ 41; Pl.'s SMF ¶ 41; Def.'s Ex. 14 at 1.) The memo stated that managers must ensure that "employees clock in and remain clocked in at all times they are performing work for La Quinta" and they "are paid through payroll for all time worked." (Def.'s SMF ¶ 42; Pl.'s SMF ¶ 42; Def.'s Ex. 14 at 1.) The memo reminded managers that "it is *never* acceptable to instruct or allow employees to work off the clock or offer other forms of payment (e.g., gift cards, cash payment, etc.) for time worked, even if the employee volunteers or agrees to such an arrangement." (Def.'s SMF ¶ 43; Pl.'s SMF ¶ 43; Def.'s Ex. 14 at 1-2.) Managers who failed to comply with LQ's time reporting policies faced "disciplinary action up to and including termination of employment." (*Id.*) Weisenbach signed an acknowledgment of this memo on April 26, 2010. (Def.'s SMF ¶ 43; Pl.'s SMF ¶ 43; Def.'s Ex. 14 at 2.)

LQ sent an additional memo to managers by e-mail on July 1, 2010, warning that the Department of Labor ("DOL") was targeting the hotel industry for audits. (Def.'s SMF ¶ 44; Pl.'s SMF ¶ 44; Def.'s Ex. 15.) The memo provided a link to LQ's wage and hour tips. (*Id.*) Finally, LQ sent another, similar email memo to managers on May 4, 2011, emphasizing that managers were to "ensure that employees are paid through payroll for all time worked," and reemphasizing that managers should "NOT allow employees to work off the clock" and "it is *never* acceptable to instruct or allow employees to work off the clock or offer other forms of payment . . . for time worked." (Def.'s SMF ¶ 46; Pl.'s SMF ¶ 46; Def.'s Ex. 16.)

### C.      Discrimination Claim

On September 28, 2012, Weisenbach filed a charge of discrimination with the Connecticut Commission on Human Rights & Opportunities ("CHRO"), alleging age discrimination in violation of the CFEPA.[4] (Def.'s SMF ¶ 57; Pl.'s SMF ¶ 57.) Weisenbach filed a one-count complaint in the Superior Court of Connecticut, Judicial District of New Haven, on October 23, 2013, and LQ removed the case to this Court on November 11, 2013. (Notice of Removal, ECF No. 1.)

Prior to his termination, Weisenbach never complained to LQ that he suffered from discriminatory treatment. (Def.'s SMF ¶ 56; Pl.'s SMF ¶ 56.) Weisenbach now alleges, and testified in his deposition (Pl.'s Ex. 2, ECF No. 41-3, Weisenbach Tr. at 14), that Berry made at least three disparaging age-based comments. First, Berry allegedly told Weisenbach, repeatedly, that "the future of the company was with the youth." (Def.'s SMF ¶ 58; Pl.'s SMF ¶ 58; Weisenbach Tr. at 120, 153-56.) Weisenbach also testified that on Berry's second visit to Weisenbach's hotel—prior to the February 3, 2012 written warning—Berry told him, that "in this day and age and with all of the technology out there, you, along with your generation should be able to research it and locate the information." (Def.'s SMF ¶¶ 59-60; Pl.'s SMF ¶¶ 59-60; Weisenbach Tr. at 167-72.) Weisenbach testified that Berry made this comment to him after learning that Weisenbach was having difficulty finding a specific cover for tissue boxes that Berry had asked him to find. (Pl.'s Stmt. Disputed Facts ¶ 30; Weisenbach Tr. 167-72.) Finally,

---

[4] Conn. Gen. Stat. § 46a-60(a)(1) provides that it is an unlawful employment practice for:

> an employer, by the employer or the employer's agent, except in the case of a bona fide occupational qualification or need, to . . . discharge from employment any individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment because of the individual's . . . age. . . .

Weisenbach testified that on Berry's third visit to the hotel—which was also prior to the February 3, 2012 written warning—Berry told Weisenbach that he could "accept that level of performance from younger, inexperienced GMs but, with older, experienced GMs, it can't be tolerated." (Def.'s SMF ¶ 61; Pl.'s SMF ¶ 61; Weisenbach Tr. 172-76.) Weisenbach contends that Berry made this statement as he was criticizing Weisenbach for his performance on a project, and that Berry again commented that the future of the company was with the youth. (Pl.'s Stmt. Disputed Facts ¶ 31; Weisenbach Tr. 172-76.) Weisenbach does not allege that Hughes, Babl, or Smith discriminated against him (Def.'s SMF ¶¶ 24-27; Pl.'s SMF ¶¶ 24-27), and he testified that "if Berry had nothing to do" with his termination, Weisenbach would not believe that he suffered age discrimination. (Def.'s SMF ¶ 30; Weisenbach Tr. at 152.)

## II.   <u>STANDARD</u>

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Williams v. Utica Coll. of Syracuse Univ.*, 453 F.3d 112, 116 (2d Cir. 2006) (internal quotation marks and citation omitted). In reviewing the record, the court must "construe the facts in the light most favorable to the non-moving party," *Breyer v. County of Nassau*, 524 F.3d 160, 163 (2d Cir. 2008), and "resolve all ambiguities and draw all inferences in favor of the nonmoving party in order to determine how a reasonable jury would decide." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir. 1992). If the moving party carries its burden, "the opposing party must come forward with specific evidence demonstrating

11

the existence of a genuine dispute of material fact." *Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011). The ultimate test "is whether the evidence can reasonably support a verdict in Plaintiff's favor." *James v. N.Y. Racing Ass'n,* 233 F.3d 149, 157 (2d Cir.2000).

## III.   <u>DISCUSSION</u>

Both parties agree that Weisenbach's claim of age discrimination in violation of the CFEPA is subject to the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).[5]

> [A] plaintiff first bears the "minimal" burden of setting out a prima facie discrimination case, and is then aided by a presumption of discrimination unless the defendant proffers a "legitimate, nondiscriminatory reason" for the adverse employment action, in which event, the presumption evaporates and the plaintiff must prove that the employer's proffered reason was a pretext for discrimination.

*Irizarry v. United Parcel Serv., Inc.*, No. 3:11-CV-01658 JCH, 2014 WL 1246684, at *11 (D. Conn. Mar. 24, 2014) (quoting *McPherson v. New York City Dep't of Educ.*, 457 F.3d 211, 215 (2d Cir. 2006)).

### A.   *Prima Facie* Case

To establish a *prima facie* case of age discrimination, a plaintiff must show that: (1) he was within the protected age group, *i.e.* he was at least 40 years old, (2) he was qualified for the position, (3) he experienced an adverse employment action, and (4) such action occurred under circumstances giving rise to an inference of discrimination. *Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 107 (2d Cir. 2010). It is undisputed that Weisenbach was a member of the protected age group, was qualified for his position, and experienced an adverse employment action (termination). Therefore, having established the first three elements of his *prima facie* case,

---

[5] Age discrimination claims brought under the CFEPA are generally evaluated under the same standards that govern the ADEA. *See Fasoli v. City of Stamford*, 64 F. Supp. 3d 285, 313 (D. Conn. 2014).

Weisenbach must next come forward with sufficient admissible evidence suggesting that his termination occurred under circumstances that give rise to an inference of discrimination. *Irizarry*, 2014 WL 1246684, at *12.

Weisenbach argues that King, his replacement, was—at 49 years old—significantly younger than he was. Although King was also over 40 years old, "an employer's decision to replace an older worker with a significantly younger one can support an inference of intentional age discrimination even when both persons" are members of the protected class. *Woodman v. WWOR-TV, Inc.*, 411 F.3d 69, 78-79 (2d Cir. 2005) (citing *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996)). The plaintiff, however, must show some evidence that the defendant-employer acted with knowledge about the age discrepancy between the plaintiff and his replacement. *Woodman,* 411 F.3d at 78-79. Citing Berry's affidavit, LQ argues that Berry did not know King's age at the time she was selected to replace Weisenbach. (Def.'s Ex. 6, Berry Aff., ECF No. 32-6 at 1.) Nevertheless, a reasonable juror could find that Berry knew King's age relative to Weisenbach because he supervised Weisenbach and he had met King prior to hiring her to replace Weisenbach. (Def.'s Ex. 2, Berry Tr., ECF No. 32-5 at 72 (Berry testified that, before hiring King to replace Weisenbach, "I didn't know her, no. I'd met her, but I didn't know her.").) And it was Berry who, several months before he terminated Weisenbach, had assigned King to work at the New Haven hotel. (Def.'s Ex. 2, ECF No. 32-5, Berry Tr. at 72-73 ("Charlie had requested some help at the property to try to get things going in the right direction, and so I sent Laura.").)

LQ argues that the age difference between Weisenbach and King was insignificant. The Second Circuit has declined to "draw any bright line . . . as to the degree of age discrepancy that can or cannot support an inference of discriminatory intent." *Woodman,* 411 F.3d at 78 n.9;

*compare Glenwright v. Xerox Corp.*, 832 F. Supp. 2d 268, 276 (W.D.N.Y. 2011) (evidence that a six year age difference between a 46-year-old who was replaced by a 40-year-old "is not sufficient to create an inference of age discrimination because [the replacement] was not significantly younger than [plaintiff]"), *with Byrnie v. Town of Cromwell, Bd. of Educ.*, 243 F.3d 93, 102 (2d Cir. 2001) (finding that a 22 year age difference is substantial); *see also D'Cunha v. Genovese/Eckerd Corp.*, 479 F.3d 193, 195 (2d Cir.2007) (plaintiff met the fourth element of a prima facie case where "one of the individuals who was offered a position was eight years younger"); *Moree v. Frank H. Reis, Inc.*, No. 00 CIV. 4632 (CM), 2001 WL 736810, at *6 (S.D.N.Y. June 25, 2001) ("courts in this district have generally recognized that age differences of ten years or more are sufficient to give rise to an inference of age discrimination").

Weisenbach was 62 years old when he was terminated and King was 49 years old when she replaced him. This age difference is sufficient to create an inference of age discrimination. Thus, Weisenbach has satisfied his minimal burden of coming forward with sufficient admissible evidence suggesting that his termination occurred under circumstances that give rise to an inference of discrimination.

### B.   Legitimate Nondiscriminatory Reason

There is no dispute that LQ has stated a legitimate, non-discriminatory reason for terminating Weisenbach: his violation of LQ's wage and hour policies by paying an LQ employee $120 from the hotel's petty cash fund to remove chairs from guest rooms. (Pl.'s Opp. Br., ECF No. 41 at 24-25.) LQ has supported its reason with extensive documentation, including policy statements from the LQ Employee Handbook and memoranda reminding managers of the importance of complying with LQ's wage and hour policies. LQ also provided evidence of Weisenbach's signed acknowledgment that he received the LQ Handbook. Finally, LQ provided

14

the e-mail exchange between Smith, Babl, and Hughes in which Smith reported Weisenbach's suspected policy violation.

As LQ points out, and Weisenbach does not contest, violation of company policies is a legitimate, non-discriminatory reason for an employer to take adverse employment actions. *See, e.g., Shumway v. United Parcel Serv., Inc.*, 118 F.3d 60, 65 (2d Cir. 1997) (violation of "no fraternization" policy was a legitimate, non-discriminatory reason for termination); *Greenfield v. McDonald's Corp.*, No. 3:10-CV-40 VLB, 2011 WL 3859717, at *7 (D. Conn. Sept. 1, 2011) (plaintiff's violation of employer's policy not to have physical altercations was a legitimate non-discriminatory reason for adverse employment action). Thus, LQ has satisfied its burden of producing a legitimate, non-discriminatory reason for Weisenbach's termination.

### C.      Pretext and Causal Standards

Because LQ has articulated a legitimate, non-discriminatory reason for Weisenbach's termination—namely, his failure to comply with LQ's wage and hour polices—Weisenbach must submit evidence sufficient to permit a reasonable fact-finder to conclude that LQ's explanation is pretextual. A showing of pretext requires that Weisenbach "demonstrate both that [his] employer's stated reason was untrue or incomplete, and that discrimination played a causal role in [his] discharge." *Smith v. Connecticut Packaging Materials*, No. 3:13-CV-00550 JAM, 2015 WL 235148, at *2 (D. Conn. Jan. 16, 2015) (citing *Henry v. Wyeth Pharm., Inc.,* 616 F.3d 134, 157 (2d Cir.2010)). "[O]nce the employer articulates a legitimate reason for its decision, the ultimate burden of proving that the challenged employment decision was the result of intentional discrimination remains with the plaintiff." *Luciano v. Olsten Corp.*, 110 F.3d 210, 218 (2d Cir. 1997) (internal citations omitted).

Prior to the Supreme Court's decision in *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009), a plaintiff who brought a claim under the ADEA could prevail at summary judgment by demonstrating that his or her age was a "motivating factor" in the adverse employment action. *Gorzynski*, 596 F.3d at 105-06. In *Gross,* however, the Supreme Court held that this "motivating factor" standard does not apply to claims under the ADEA, and an ADEA plaintiff must prove that age was a "but for" cause of the adverse employment action. "Proof of a 'but for' cause for the adverse action requires evidence from the plaintiff that the adverse action would not have occurred in the absence of discrimination." *Fetcho v. Hearst Connecticut Post, LLC*, No. 3:12-CV-904 GWC, 2015 WL 1800111, at *6 (D. Conn. Apr. 16, 2015). The Supreme Court's decision in *Gross* focused on the text of the ADEA, which states that "[i]t shall be unlawful for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, *because* of such individual's age." 29 U.S.C. § 623(a)(1) (emphasis added). The Supreme Court interpreted the phrase "because of" to require "but for" causation. By contrast, Congress amended Title VII of the Civil Rights Act of 1964—which governs federal discrimination claims based on race, color, religion, sex, or national origin—"by explicitly authorizing discrimination claims in which an improper consideration was 'a motivating factor' for an adverse employment decision." *Gross*, 557 U.S. at 174; *see* 42 U.S.C. § 2000e–2(m) (providing that "an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was *a motivating factor* for any employment practice, even though other factors also motivated the practice" (emphasis added)).

In this case, Weisenbach has brought a claim under the CFEPA, not the ADEA. The text of the CFEPA provides that it is unlawful for an employer to discharge or discriminate against an

employee "*because of* the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, present or past history of mental disability, intellectual disability, learning disability or physical disability . . . ." Conn. Gen. Stat. § 46a-60(a)(1) (emphasis added). In addition, the CFEPA has not been amended to add language expressly stating that it is also unlawful to discriminate if a prohibited reason is a motivating factor. Since *Gross,* however, neither the Connecticut Supreme Court nor the Connecticut Appellate Court has expressly addressed whether the "motivating factor" standard still applies to CFEPA claims.[6]

Connecticut trial courts, however, have continued to apply the "motivating factor" standard and have declined to require the "but for" standard for age-discrimination claims under the CFEPA. *See, e.g., Frederick v. Gladeview Health Care Ctr., Inc.*, No. CV116011350, 2014 WL 1876955, at *5 (Conn. Super. Ct. Apr. 10, 2014) ("Until our appellate courts say otherwise, this court will continue to apply the 'mixed motive' and 'pretext' models discussed by our state Supreme Court in *Levy v. Commission on Human Rights & Opportunities*, [236 Conn. 96, 104-05 (1996)]"); *Wagner v. Bd. of Trustees for Connecticut State Univ.*, No. HHDCV085023775S,

---

[6] In *Marasco v. Connecticut Reg'l Vocational-Technical Sch. Sys.*, 153 Conn. App. 146 (2014), the Connecticut Appellate Court affirmed a trial court's grant of summary judgment on a plaintiff's CFEPA age discrimination claim because "[t]he plaintiff failed to produce any evidence" to counter the defendant's evidence that his "transfer was not related to, or even partially motivated by, his age." *Id.* at 161-62. In affirming the trial court on the CFEPA claim, the Connecticut Appellate Court reemphasized that "the law as it relates to discrimination claims" requires the plaintiff to "demonstrate that the reason proffered by the employer is merely a pretext and that the decision actually was motivated by illegal discriminatory bias." *Marasco*, 153 Conn. App. at 160 cert. denied, 316 Conn. 901, 111 A.3d 469 (2015). In its ruling, the trial court had distinguished the causal standards in the ADEA and the CFEPA after *Gross*, stating that "[a]lthough the ADEA is very similar [to the CFEPA] in its proof requirements, the plaintiff cannot rely on a 'mixed motive theory,' i.e. that age was more likely the motivating factor for the adverse action. Rather [for an ADEA claim] the plaintiff must establish that age was the 'but for' reason for the action." *Marasco v. Connecticut Reg'l Vocational-Technical Sch. Sys.*, No. CV095014324, 2012 WL 5476905, at *6 (Conn. Super. Ct. Oct. 15, 2012) (internal citations omitted). The Appellate Court did not specifically mention *Gross* or whether its causal standard should be adopted under the CFEPA when it affirmed the trial court's grant of summary judgment on the CFEPA claim.

2012 WL 669544, at *11 (Conn. Super. Ct. Jan. 30, 2012) (declining to require the "but for" test, and allowing the "contributing or motivating factor" test for a CFEPA age discrimination claim); *see also Dwyer v. Waterfront Enterprises, Inc.*, No. CV126032894S, 2013 WL 2947907, at *8 (Conn. Super. Ct. May 24, 2013) ("in accordance with the liberal construction afforded to CFEPA, [plaintiff] need only plead that his physical disability was a motivating factor in his termination.").

The Second Circuit has not issued a binding ruling on whether the *Gross* "but for" causation standard should apply under the CFEPA. Because the CFEPA generally follows the same legal analysis as the federal anti-discrimination law, the Second Circuit has assumed, in two non-precedential rulings, that the "but for" standard from *Gross* applies to both the ADEA and the CFEPA age discrimination claims. *See Timbie v. Eli Lilly & Co.*, 429 F. App'x 20, 22 n.1 (2d Cir. 2011) (summary order); *Rubinow v. Boehringer Ingelheim Pharm., Inc.*, 496 F. App'x 117, 118 (2d Cir. 2012) (summary order). Neither case, however, specifically discussed what standard the Connecticut Supreme Court would decide to apply to the CFEPA after *Gross*. Moreover, both rulings were summary orders, and "[r]ulings by summary order do not have precedential effect."[7] Second Circuit L.R. 32.1.1(a); *Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169 (2d Cir. 2014) ("a summary order is not citable as precedent."). In a slightly more recent summary order, the Second Circuit affirmed a district court's decision to apply both tests because of "the potential instability in Connecticut law." *Aiello v. Stamford Hosp.*, 487 F. App'x 677 (2d Cir. 2012) (summary order). In that case, even "under the prior more lenient standard," the district court had found that the plaintiff "failed to provide sufficient evidence establishing

---

[7] "[T]he rationale underlying the Rule is that such orders, being summary, frequently do not set out the factual background of the case in enough detail to disclose whether its facts are sufficiently similar to those of a subsequent unrelated case. . . ." *Jackler v. Byrne*, 658 F.3d 225, 244 (2d Cir. 2011).

that Defendant's legitimate non-discrimination reason for the adverse employment action was a pretext for age discrimination." *Aiello v. Stamford Hosp.*, No. 3:09CV1161 VLB, 2011 WL 3439459, at *27 (D. Conn. Aug. 8, 2011).

Like the district court in *Aiello*, other courts in this District have generally found it unnecessary to resolve this issue because their decisions would have been the same under either standard. *See, e.g., Fetcho*, 2015 WL 1800111, at *10 ("[t]his court does not have to venture a prediction on this issue of state law because" there was no evidence, direct or circumstantial, "that other older employees were the subject of discrimination."); *Connecticut Packaging Materials*, 2015 WL 235148, at *5, n.6 (assuming that plaintiff made out a *prima facie* case, "she has not provided enough evidence to raise a triable issue that [defendant's] legitimate, nondiscriminatory reason . . . was an untrue or incomplete explanation, and that in fact plaintiff was fired as a result of . . . discrimination" under either causation standard.); *Hasemann v. United Parcel Serv. of Am., Inc.*, No. 3:11-CV-554 VLB, 2013 WL 696424, at *13 (D. Conn. Feb. 26, 2013) (following the more lenient standard for the CFEPA, but finding that both plaintiff's ADEA and CFEPA claims fail, in part, because "he cannot establish an inference of discrimination for his prima facie case."); *Miller v. Ethan Allen Global, Inc.*, No. 3:10-CV-01701 JCH, 2012 WL 1899378, at *4-6, n.8 (D. Conn. May 24, 2012) (finding that the plaintiff failed to set forth a prima facie case); *Herbert v. Nat'l Amusements, Inc.*, 833 F. Supp. 2d 192, 203 (D. Conn. 2011) (stating that the court would "follow existing Connecticut court pronouncements on the appropriate standard to employ in applying Connecticut law" until "such time as the Connecticut courts adopt the new standard," but finding that "the Court need not address whether the mixed-motive analysis is still applicable to CFEPA claims" because the plaintiff "has met the more stringent 'but-for' standard").

In this case, however, the choice of the standard matters. Even construing the facts in the light most favorable to Weisenbach, and resolving all ambiguities and drawing all inferences in his favor, I cannot find that he has raised a genuine issue of fact as to whether discrimination was a "but for" cause of his termination, *i.e.*, whether in the absence of age discrimination, LQ would have terminated him for violating its policies. He has submitted no evidence to rebut LQ's evidence that the audit was random; that he committed a policy violation for which, according to the terms of the policy, he could be terminated; that he earlier had committed a wage and hour policy violation for which he was disciplined and warned that future violations could result in termination; and that Babl, who recommended his termination, harbored no discriminatory animus. Nor has he submitted any evidence that younger employees who had committed similar violations were not terminated or, for that matter, whether the company had ever refrained from terminating a manager-level employee who had violated its wage and hour policies twice during the course of his employment. As shown below, however, Weisenbach *has* submitted sufficient evidence to raise a genuine dispute about whether age was a motivating factor in his termination. (*See infra,* Part III.D.*)* Therefore, I must determine which causal standard applies to the CFEPA. In this diversity-jurisdiction case, that task involves "predict[ing] how [the Connecticut Supreme Court] would resolve" the issue. *Runner v. New York Stock Exch., Inc.*, 568 F.3d 383, 386 (2d Cir. 2009) (when there are uncertainties in state law, "our role as a federal court sitting in diversity . . . . [is to] carefully predict how the state's highest court would resolve the uncertainties we have identified") (internal quotation marks and citation omitted). I follow Connecticut's trial courts in predicting that the Connecticut Supreme Court will continue to apply the more lenient "motivating factor" standard to CFEPA age discrimination claims.

First, "while often a source of great assistance and persuasive force . . . it is axiomatic that decisions of the United States Supreme Court are not binding on Connecticut courts tasked with interpreting [their] General Statutes. Rather, Connecticut is the final arbiter of its own laws." *Vollemans v. Town of Wallingford*, 103 Conn. App. 188, 199 (2007) (internal quotation marks omitted).

Second, unlike the federal statutory scheme, Connecticut does not have a separate statute for age discrimination. The CFEPA provides that it is unlawful for an employer to discharge or discriminate against an employee "because of the individual's race, color, religious creed, age, sex, gender identity or expression, marital status, national origin, ancestry, . . . mental disability, intellectual disability, learning disability or physical disability . . . ." Conn. Gen. Stat. § 46a-60(a)(1). Although the CFEPA includes the "because of" language that the ADEA interpreted in *Gross*, Connecticut courts have applied the "motivating factor" standard to all types of CFEPA discrimination claims. *See Miko v. Comm'n on Human Rights & Opportunities*, 220 Conn. 192, 205-207 (1991) (adopting the "mixed motive" analysis from *Price Waterhouse v. Hopkins,* 490 U.S. 228 (1989)); *see also Jacobs v. Gen. Elec. Co.*, 275 Conn. 395, 401 (2005) (CFEPA age discrimination) (emphasizing that the plaintiff has "ultimate burden of persuading the court that [he] has been the victim of intentional discrimination. [He] may succeed in this . . . by persuading the court that a discriminatory reason more likely motivated the employer or . . . by showing that the employer's proffered explanation is unworthy of credence."); *Levy v. Comm'n on Human Rights & Opportunities*, 236 Conn. 96, 106 (1996) (CFEPA disability discrimination) (plaintiff in a "mixed-motives" case "must focus his proof directly at the question of discrimination and prove that an illegitimate factor had a 'motivating' or 'substantial' role in the employment decision"). And it is unlikely that Connecticut would adopt one causal standard for

age and use another standard for the other types of discrimination that are protected by the same statute. *See Dwyer*, 2013 WL 2947907, at *7 ("The traits protected at the federal level by Title VII, the ADA and the ADEA are all protected by a single statute in Connecticut—CFEPA—the meaning of which has been previously determined. It would be largely unworkable to ascribe different interpretations to the same language in the same statute depending on the context in which the statute is invoked."); *Wagner*, 2012 WL 669544, at *11 ("Although our legislature has amended § 46a–60 several times over the years, no amendment has addressed the standard of proof. Given the legislature's decision to include multiple types of unlawful employment discrimination within a single statutory provision without setting out distinctive standards for the different types, the logical conclusion is that it intended that the same standard of proof be applied to all the types of discrimination set forth in § 46a–60.")

Finally, the "CFEPA defines important rights designed to rid the workplace of discrimination . . . As such, the act is composed of remedial statutes, which are to be construed liberally to effectuate their beneficent purposes." *Vollemans*, 103 Conn. App. 197 (internal quotation marks and citations omitted). Given this remedial purpose, and for the reasons discussed above, it is unlikely that the Connecticut Supreme Court would overrule its prior case law applying the more lenient "motivating factor" standard in discrimination cases under the CFEPA.

### D. Berry's Age-Based Comments and Criticisms of Weisenbach

Weisenbach contends that Berry made comments that disparaged older workers, and these may be used as evidence in support of his timely CFEPA claim.[8] In addition to these

---

[8] Although Berry's comments were made more than 180 days before Weisenbach filed his CHRO charge, they still may be used to prove discriminatory intent. *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002).

comments, the record shows that Weisenbach received generally positive reviews until Berry became his supervisor, after which he received verbal criticisms of his work performance and a written warning. A reasonable juror could infer from Berry's age-based comments—together with his criticism of Weisenbach in the seven months that he supervised him prior to the termination—that age was a motivating factor in LQ's decision to terminate Weisenbach.

Prinzo, Weisenbach's first supervisor at LQ, gave Weisenbach a positive review in September 2007, after Weisenbach had been working for LQ for approximately seven months. (Pl.'s Stmt. Disputed Facts ¶ 17.) Prinzo stated that "Charlie shows tremendous leadership and commitment to his property. He has developed a successful team of associates that pull together to achieve the necessary goals . . . ." (*Id.* ¶ 17.) During the time that Dailey supervised him, from 2007-2011, Weisenbach received positive annual reviews commending, among other things, his sound work habits, efforts, openness to trying new things, improvements in staff and product quality, teamwork, and low staff turnover (less than 18% in 2010). (*Id.* ¶¶ 13-15, 19-21.) During Weisenbach's last annual review before he was terminated, which was completed in March 2011, Dailey stated that "[t]he main goals for Charlie to focus on in 2011 are the EBITDA and beating his competition in Smith Travel. This is not intended to reduce the need for better Medallia performance but simply a recognition that the age and style of Charlie's hotel does not lend itself to high SIR scores." (*Id.* ¶ 21.)

Weisenbach received only one written warning during the period from 2007 until 2011. In March of 2009, Weisenbach changed the hours for some employees—by deducting time— because he believed that they were not clocking out when they had completed their work. This violated LQ's wage and hour policies. (Def.'s SMF ¶ 49; Pl.'s SMF ¶ 49.) Even in the written warning, however, Dailey commended Weisenbach's honesty and openness, writing that "due to

Charlie's honesty in offering this information openly and the belief that Charlie's intent was not malicious or to falsify labor records, the decision was made to make this a first level written warning." (Pl.'s Stmt. Disputed Facts ¶ 77.)

Berry replaced Weisenbach in the fall of 2011, and began making negative age-based remarks to Weisenbach in the context of criticizing Weisenbach's work. Weisenbach testified that Berry told him, on multiple occasions, that "the future of the company was with the youth." (Def.'s SMF ¶ 58; Pl.'s SMF ¶ 58; Weisenbach Tr. at 120, 153-154.) Weisenbach also testified that, during Berry's second visit to the hotel, Berry told him that, "in this day and age and with all of the technology out there, you, along with your generation should be able to research . . . and locate the information." (Def.'s SMF ¶¶ 59-60; Pl.'s SMF ¶¶ 59-60; Weisenbach Tr. at 167-72.) Weisenbach testified that Berry similarly made this comment to him while criticizing Weisenbach after he told Berry that he was having difficulty finding a specific tissue box cover that Berry had asked him to find. (Pl.'s Stmt. Disputed Facts ¶ 30; Weisenbach Tr. at 167-72.) Finally, Weisenbach testified that on Berry's third visit to the hotel, Berry told Weisenbach that he could "accept that level of performance from younger, inexperienced GMs but, with older, experienced GMs, it can't be tolerated." (Def.'s SMF ¶ 61; Pl.'s SMF ¶ 61; Weisenbach Tr. at 172-76.) Weisenbach contends that Berry made this statement as he was criticizing Weisenbach for his performance on a project, and that during this visit, Berry again commented that the future of the company is with the youth. (Pl.'s Stmt. Disputed Facts ¶ 31; Weisenbach Tr. at 172-76.) Berry allegedly made all of these statements prior to issuing a written warning to Weisenbach on February 3, 2012.

The February 3, 2012 written warning stated that Weisenbach had violated "company conduct standards as outlined on pages 16 and 17 of the employee handbook" because of his

"insubordination" and "failure to provide guest service in accordance with the hotel's service philosophy or failure to satisfactorily perform work or job assignments." (Pl.'s Ex. 9, ECF No. 41-10 at 1; Def.'s Ex. 7, ECF No. 32-6 at 1.) Specifically, Berry wrote that "many items noted as needing improvement in a previous visit to the hotel were still not up to La Quinta standards," including deep-cleaning of the Amtico floors, the bed-making process, the guest-room sheers, and the condition of the tile and grout behind the toilet. (*Id.*) Berry added that "[t]he Satisfied Intent to Return score at property #2048 is a direct reflection of Charlie's ability to train his staff and hold them accountable for La Quinta standards of service and cleanliness. With a current SIR score of 65.1, property #2048 continues to fail in this metric. Additionally, property #2048's SIR score continues to fall below its score from the previous year." (*Id.*) Weisenbach's response on the form asserted that he needed capital funds to resolve certain ongoing product quality issues, including the working condition of guest room doors, sagging mattresses, old case goods, outdated bathrooms and leaking windows causing ceiling damage, that appear in the Medallia surveys. (Pl.'s Ex. 9, ECF No. 41-10 at 4; Def.'s Ex. 7, ECF No. 32-6 at 4.) Thus, Weisenbach argues that Berry's written warning was based on items like bathroom tile and grout, which required capital expenditures that LQ was unwilling to make, and on low the hotel's low SIR scores, which contradicted Dailey's recognition "that the age and style of Charlie's hotel does not lend itself to high SIR scores." (Pl.'s Stmt. Disputed Facts ¶ 21.)

"[Discriminatory] comments may constitute evidence of an intention to discriminate, but only if a sufficient nexus exists between the comments and the termination decision." *Graham v. Elmira City Sch. Dist.*, No. 6:10-CV-6645T, 2015 WL 1383657, at *6 (W.D.N.Y. Mar. 25, 2015) (internal citations omitted). "If no such nexus exists, the comments are merely 'stray remarks' which do not lead to an inference of discrimination." *Brown v. AstraZeneca Pharm., L.P.*, No.

CV 03 6166 DGT, 2006 WL 2376380, at *7 (E.D.N.Y. Aug. 16, 2006). District courts in this

circuit consider the following factors in determining whether statements are "stray remarks" or

probative of discrimination:

> (1) who made the remark (i.e., a decision-maker, a supervisor, or a low-level co-worker); (2) when the remark was made in relation to the employment decision at issue; (3) the content of the remark (i.e., whether a reasonable juror could view the remark as discriminatory); and (4) the context in which the remark was made (i.e., whether it was related to the decision-making process).

*Henry*, 616 F.3d at 149 (2d Cir. 2010).

In this case, Berry—Weisenbach's supervisor and the decision-maker in his

termination—made all three comments. None of the comments were made at the time that

Weisenbach was terminated, but they were all made during the seven months that Berry

supervised Weisenbach before terminating him, and they were also made in the context of

criticizing Weisenbach's job performance prior to Berry giving Weisenbach a written warning in

February 2012.

Berry denies that he ever told Weisenbach that the "future of the company was with the

youth." Even if he did say it, LQ argues that this comment was not discriminatory because it is a

statement of "common sense," and "[i]t is a reality of the workplace" that the future is with the

youth. (Def.'s Br., ECF No. 32-1 at 24-25.) LQ also argues that such a statement is innocuous

"particularly when made by an individual over the age of 50 to another individual over the age of

50." (Def.'s Br., ECF No. 32-1 at 25.) But a reasonable juror could also interpret this comment

as evidence of Berry's discriminatory animus towards people in the protected age class. LQ cites

cases from several other circuits in support of its argument that such a comment is insufficient to

demonstrate bias. As Weisenbach points out, however, these cases are distinguishable. None of

them are from the Second Circuit, and the comments were not directed at the plaintiffs in those

cases. In contrast, Weisenbach alleges that Berry made the comment that "the future of the

company was with the youth" directly to Weisenbach, on several occasions after becoming Weisenbach's supervisor "in the context of growing criticism about Weisenbach's work performance." (Pl.'s Opp. Br., ECF No. 41 at 31.) Viewing all of the comments together, in the light most favorable to Weisenbach, a reasonable juror could interpret them as disparaging of older workers, and as evidence of Berry's intent in accepting the recommendation to terminate Weisenbach in April 2012. In other words, the evidence is sufficient for a reasonable juror to find that at least part of Berry's motivation for the termination was age-based animus. Thus Weisenbach's evidence—while not overwhelming—is sufficient to raise genuine issues of material fact about whether age was a motivating factor in his termination.

## IV.  CONCLUSION

For the foregoing reasons, the Court DENIES LQ's motion for summary judgment.

IT IS SO ORDERED.

                                        /s/
                                        Michael P. Shea, U.S.D.J.

Dated:        Hartford, Connecticut
              September 25, 2015